# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BOBBY L. WILLISON                   *

        Plaintiff                   *

        v.                             *

                                              Civil No. CCB-09-01687

PRABHAKAR PANDEY, et al.         *

        Defendants               *

                                    *

******

## MEMORANDUM

Bobby Willison has sued Dr. Prabhakar Pandey and the WMHS Braddock Hospital Corporation ("WMHS"), alleging negligence in connection with kidney surgery performed by Dr. Pandey in March 2006, while he was employed by WMHS.[1] Now pending before the court is a "Motion To Exclude Expert Witness" (ECF 66), recently filed by Dr. Pandey and WMHS.[2] Plaintiff opposes the motion, ECF 69, to which defendants have replied. ECF 72. No hearing is necessary to resolve the motion. *See* Local Rule 105.6. I will deny defendant's motion.

### Factual Background

On September 1, 2009, Judge Blake issued a Scheduling Order (ECF 11), which expressly provided that *Daubert* motions were due by February 26, 2010.[3] On November 16, 2009, Judge Blake issued an Order setting forth additional scheduling matters and instructions

---

[1] Jurisdiction is based on diversity of citizenship.

[2] Trial is scheduled to commence on October 17, 2011. Although the case is assigned to Judge Catherine Blake, I have agreed to preside at the trial, due to a conflict in Judge Blake's schedule.

[3] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

relating to pretrial and trial preparation. ECF 13. In that Order, the Court set forth a deadline for submission of the pretrial order and motions in limine, exclusive of *Daubert* motions. Then, on June 14, 2010, the Court issued another Order (ECF 29) pertaining to the revised trial schedule. Notably, ECF 29 set a revised deadline of November 19, 2010, for the filing of dispositive motions *and Daubert* motions.

Plaintiff designated Sol Usher, M.D. as an expert in the field of urology and as his sole expert with respect to the alleged medical malpractice committed by the defendants. The defense deposed Dr. Usher in New York on December 16, 2009.

Trial was scheduled for February 27, 2011. However, on January 25, 2011, plaintiff filed an emergency motion to postpone the trial date, due to Mr. Willison's medical condition. ECF 50. That motion was granted. ECF 51. No request was made to extend the date for the filing of any *Daubert* motions. Trial was rescheduled for October 17, 2011.

On September 27, 2011, plaintiffs took the videotaped *de bene esse* deposition of Dr. Usher. The next day, Judge Blake conducted a pretrial conference with counsel. Because it was already known that I was to preside at the trial, I, too, attended the pretrial conference. At that conference, counsel addressed various matters relevant to the trial, including the parties' dispute that is the subject of Plaintiff's Motion To Edit/Strike Testimony (ECF 67). At no time did defense counsel indicate to the Court that they planned to challenge Dr. Usher's qualifications to testify as an expert.

Thereafter, on October 3, 2011, the defense filed the motion at issue (ECF 66), alleging for the first time that Dr. Usher's proposed expert testimony fails to comply with § 3-2A-02(c)(1) of the Courts and Judicial Proceedings Article ("C.J.") of the Maryland Code. It provides:

**§ 3-2A-02. Exclusiveness of Procedures.**
* * *
(c) *Establishing liability of health care provider; qualifications of persons testifying.* – (1) In any action for damages filed under this subtitle, the health care provider is not liable for the payment of damages unless it is established that the care given by the health care provider is not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

At the *de bene esse* deposition of Dr. Usher, Dr. Pandey's counsel sought to voir dire Dr. Usher with respect to his expert qualifications. The following exchange is relevant:

[COUNSEL FOR DR. PANDEY]: Now, Doctor, you are licensed, as you indicated, only to practice in the State of New York; correct?

[DR. USHER]: Correct.

[COUNSEL FOR DR. PANDEY]: You are not familiar with the Cumberland, Maryland, medical community; correct?

[DR. USHER]: There is no need to be.

[COUNSEL FOR DR. PANDEY]: You've not done any research on the Cumberland medical community; correct?

[DR. USHER]: No. My knowledge s urology and what's considered appropriate care and what's not.

[COUNSEL FOR DR. PANDEY]: You've not –

[DR. USHER]: And –

[COUNSEL FOR DR. PANDEY]: You've not done anything to look at the demographics of [the] Western Maryland Health System; correct?

[DR. USHER]: I don't see they have any relevance to medical urologic care.

[COUNSEL FOR DR. PANDEY]: You've not done anything to familiarize yourself with the Western Maryland Health System itself; correct?

[DR. USHER]: I feel it was not necessary.

3

> [COUNSEL FOR DR. PANDEY]: You've never practiced in the State of Maryland, true?
>
> [DR. USHER]: Well, you know the answer to that.
>
> [COUNSEL FOR DR. PANDEY]: Well, am I correct that you've never practiced in the State of Maryland?
>
> [DR. USHER]: That's correct.
>
> [COUNSEL FOR DR. PANDEY]: Never had a license in the State of Maryland?
>
> [DR. USHER]: No, I have not.
>
> [COUNSEL FOR DR. PANDEY]: You don't have any colleagues located in Cumberland, Maryland; correct?
>
> [DR. USHER]: No, I don't.
>
> [COUNSEL FOR DR. PANDEY]: So you have no personal knowledge of the medical community as it exists in Cumberland, Maryland?
>
> [DR. USHER]: I don't.
>
> (ECF 66-2, page 23, line 15 to page 25, line 6)

Thereafter, plaintiff's counsel questioned Dr. Usher regarding the standard of care. The following colloquy is pertinent:

> [MR. ROSASCO]: The expression standard of care, what does that typically mean in a malpractice case like this?
>
> [DR. USHER]: The standard of care means that what most competent -- I don't mean most competent -- the majority of competent urologists would do in a situation given a certain disease entity. What is the proper care for this condition. That is the standard of care.
>
> (ECF 66-2 page 35, lines 6-15)

The defense omits from its motion the following testimonial exchange between plaintiff's counsel and Dr. Usher, which is also relevant:

4

[COUNSEL FOR DR. PANDEY]: Let me ask you, are you familiar with the expression of standard of care?

[DR. USHER]: Yes, I am.

[COUNSEL FOR DR. PANDEY]: In urology, is there a national standard of care?

[DR. USHER]: There certainly is.

[COUNSEL FOR DR. PANDEY]: Can you tell me what that is and how that would apply New York versus Western Maryland?

[DR. USHER]: Well, I have never heard that urology standards change based on the community where the urology is being delivered. So this is something new to me. And in conditions where, especially with cancer, there are criteria and standards of what is appropriate and what is not, and I can't imagine that because a patient is in a smaller hospital in a more rural area that he should be not entitled or should not receive the level of care that a patient anywhere else in that state or in this country should get.

(ECF 66-2, page 33, line 18 to page 34, line 14)

Later, on cross-examination, Dr. Pandey's attorney asked Dr. Usher if he was "familiar with the guideline for management of clinical T1 renal masses," to which Dr. Usher responded, "I am." *See* ECF 66-2, page 68, lines 19-22. Dr. Pandey's attorney also asked: "It's published by the American Urological Association?" Dr. Usher responded in the affirmative. *See* ECF 66-2, page 68, lines 23-25. Implicitly, that question suggested that there are national standards for the management of a clinical T1 renal mass.

## Discussion

Defendants argue in their motion that "Dr. Usher is not familiar with the standard of care 'among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action,'" as required by C.J. § 3-2A-02. ECF 66-1 at 5. Therefore, they claim that Dr. Usher

5

"should not be permitted to testify as an expert witness at the trial of this matter." In my view, that contention is, in essence, a *Daubert* motion; the grounds advanced in ECF 66 pertain to Dr. Usher's qualifications to testify as an expert.

The time for the filing of a *Daubert* motion has long since passed. Given that defense counsel deposed Dr. Usher on December 16, 2009 -- almost two years ago -- there is no justification for their delay in filing this motion shortly before the scheduled trial date of October 17, 2011. I shall therefore deny the motion as untimely.

Alternatively, the motion lacks merit.

As indicated, defendants rely on C.J. § 3-2A-02(c)(1), which is part of the Maryland Health Care Malpractice Claims Act. *See Davison v. Sinai Hosp. of Baltimore, Inc.*, 462 F.Supp. 778, 779 (D. Md. 1978), *aff'd*, 617 F.2d 361 (4th Cir. 1980). They concede that they are "unaware of any reported decision that has interpreted Section 3-2A-02(c)(1). . . ." ECF 66-1 at 4. In support of their position, they point to decisions of the State of North Carolina, which has a similar statute. *See, e.g.*, *Purvis v. Moses H. Cone Mem. Hosp.*, 175 N.C. App. 474, 480-81, 624 S.E. 2d 380, 385-86 (N.C. 2006) (barring the testimony of an expert in a medical malpractice case, because he was "not competent to testify," in that he was not "familiar with the standard of care in the same or similar community" at the relevant time). Those cases are unpersuasive.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the petitioners, two minor children born with serious birth defects, along with their parents, filed suit in a California State court, alleging that the birth defects had been caused by the mothers' ingestion of Bendectin, a prescription anti-nausea drug. *Id.* The suit was removed to federal court on diversity grounds. The Supreme Court considered the "standard for admitting expert scientific

6

testimony in a federal trial," *id.* at 582, and concluded that the *Frye* standard was superseded by the adoption of the Federal Rules of Evidence. *Id.* at 587. It noted that the text of Fed. R. Evid. 702 does not establish "'general acceptance'" in the community as "an absolute prerequisite to admissibility." *Id.* at 588.

Under Rule 702 of the Federal Rules of Evidence, an expert's testimony is admissible so long as (1) "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," (2) the witness is "qualified as an expert by knowledge, skill, experience, training, or education," (3) "the testimony is based upon sufficient facts or data," (4) "the testimony is the product of reliable principles and methods," and (5) "the witness has applied the principles and methods reliably to the facts of the case." Dr. Usher's deposition contradicts the defense contention that he is not qualified as an expert merely because he has not examined the medical practices in Western Maryland.

In my view, Dr. Usher's testimony satisfies Rule 702. Dr. Usher made clear at his *de bene esse* deposition that, in his view, urology standards do not change based on the community where the medical service is delivered. He explained that there national are criteria as to what is appropriate, which do not vary from one locale to another. And, he testified to the reasons that led him to conclude that Dr. Pandey's decisions were outside the standard of care.

In relying on C.J. § 3-2A-02, the defense seems to suggest that Maryland law governs this issue, and that Maryland applies a "strict locality" standard for an expert witness. Assuming Maryland law applies, the standard articulated by the defense was rejected long ago by the Maryland Court of Appeals.

In *Raitt v. The Johns Hopkins Hosp.*, 274 Md. 489, 336 A.2d 90 (1975), the trial court

refused to permit the plaintiff's expert witnesses to testify as to the standard of care because none "had ever practiced or treated patients in Maryland. . . ." *Id.* at 497, 94. As the Maryland Court of Appeals put it, "The import of the trial court ruling . . . was that [plaintiff's] expert witnesses were unqualified, as a matter of law, to render their opinions on the applicable standard of care. In so holding, the court erred." *Id.* at 500, 96. The Maryland Court of Appeals further explained: "There is no absolute requirement that [the expert] practice or reside in the defendant-physician's community." *Id.*

*Shilkret v. The Annapolis Emergency Hosp. Ass'n,* 276 Md. 187, 349 A.2d 245 (1975), also provides guidance. In that case, the Maryland Court of Appeals again considered "the proper standard of care to be applied in medical malpractice cases." *Id.* at 188, 246. There, the infant plaintiff had suffered brain damage allegedly caused by negligence in connection with the delivery. *Id.* at 189, 246. Because the trial court applied the strict locality rule as to expert medical testimony, the plaintiffs were unable to prove their case.

In addressing the question of the standard of care applicable in medical malpractice cases, the Maryland Court of Appeals stated: "It should hardly come as a surprise that [plaintiffs] advocate the adoption of the national standard or, alternatively, the similar locality rule. They claim that their proof satisfied both tests. Appellees, on the other hand, contend for the strict locality rule." *Id.* at 192, 248. In rejecting a strict locality rule, the Maryland court said: "Whatever may have justified the strict locality rule fifty or a hundred years ago, it cannot be reconciled with the realities of medical practice today." *Id.* at 194, 249. The court pointed to "a national accrediting system which has contributed to the standardization of medical schools throughout the country." *Id.* at 194, 294. Moreover, it noted the "absurdity of coupling the

8

standard of care with the doctor's community. . . ." *Id.*, n.4.  As the court said, "Were we to adopt the standard tied to locality for specialists, we would clearly be ignoring the realities of medical life.  As we have indicated, the various specialties have established uniform requirements for certification." *Id.* at 198, 251.  Thus, the court ruled: "We agree . . . that justification for the locality rules no longer exist.  The modern physician bears little resemblance to his predecessors." *Id.* at 199, 252.  Leaving no doubt as to its view, the court added: "In sum, the traditional locality rules no longer fit the present-day medical malpractice case." *Id.*

Accordingly, the court expressly held that "a physician is under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or *similar* circumstances." *Id.* at 200, 253 (emphasis added).  Further, it said: "Under this standard, advances in the profession, availability of facilities, specialization or general practice, proximity of specialists and special facilities, together with all other relevant considerations, are to be taken into account." *Id.* at 200-01, 253.  Similarly, it held that "a hospital is required to use that degree of care and skill which is expected of a reasonably competent hospital in the same or similar circumstances," based on "national standards to which all hospitals seeking accreditation must conform." *Id.* at 202, 254.

C.J. § 3-2A-02(c)(1) is not at odds with the decisions of the Maryland Court of Appeals, cited above.  It does not implement a strict locality rule.  Therefore, the defense motion is without merit.

| | |
|---|---|
| 10/11/2011 | /s/ |
| Date | Ellen L. Hollander<br>United States District Judge |

9