**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

BOBBY L. WILLISON                              *

        Plaintiff                              *

        v.                                          *
                                Civil No. CCB-09-01687
PRABHAKAR PANDEY, et al.                   *

        Defendants                            *

                       *
                 ******

**MEMORANDUM OPINION**

Bobby Willison has sued Prabhakar Pandey, M.D., and WMHS Braddock Hospital Corporation ("WMHS"), alleging negligence in connection with the diagnosis and treatment of his bilateral, synchronous kidney cancer.[1]   In April 2006, plaintiff underwent a right radical nephrectomy performed by Dr. Pandey.   According to plaintiff, it was unnecessary for Dr. Pandey to remove his entire right kidney.   In addition, plaintiff contends that, as of March 2006, Dr. Pandey knew of a mass on plaintiff's left kidney, yet he did not properly evaluate or monitor plaintiff's condition, and delayed operating until October 2007, when a left partial nephrectomy was performed.  At the relevant times, Dr. Pandey was employed by WMHS.

Now pending before the court is "Plaintiff's Motion To Edit/Strike Testimony" (ECF 67), in which plaintiff seeks to strike portions of the *de bene esse* deposition of his expert, Dr. Sol Usher, a urologist who practices in New York.   The testimony in issue primarily concerns questions posed to Dr. Usher by defense counsel about a malpractice suit pending against Dr. Usher.   Dr. Pandey opposes the motion, ECF 68, and plaintiff has filed a reply.   ECF 71.   No

---

[1] Jurisdiction is based on diversity of citizenship.

hearing is necessary to resolve the motion.  *See* Local Rule 105.6.   I will grant the motion, in part, and deny it, in part, for the reasons that follow.

### Factual Background[2]

The defense deposed Dr. Usher on December 16, 2009.  Trial was previously set for February 7, 2011.  On January 21, 2011, shortly before a previously established trial date of February 7, 2011,[3] plaintiff's counsel filed a "Motion In Limine" (ECF 48), seeking to bar the defense from questioning Dr. Usher about a medical malpractice case filed against him and others in New York.  That case, *Simon v. Usher, et al.*, is pending in the Supreme Court of the State of New York, Bronx County, Case No. 305788-09; Dr. Usher and his professional corporation are two of nine defendants.  Dr. Usher allegedly "failed to make a diagnosis (or diagnosis delayed) of kidney cancer" in the patient, Dr. Allan Simon.  ECF 48, ¶ 1.  In a Memorandum of August 8, 2011 (ECF 58), and an accompanying Order (ECF 59), Judge Blake denied the motion in limine, without prejudice.  She explained:  "The issues to be resolved under Federal Rule of Evidence 403 can be better resolved at the time of trial."  ECF 58, at 5.

Plaintiff's counsel took the videotaped *de bene esse* deposition of Dr. Usher on September 27, 2011.  At the pretrial conference held the next day, September 28, 2011, the matter of the motion in limine was again discussed.  Plaintiff was instructed to submit for court review "the portion of the deposition [transcript] of Dr. Usher which he seeks to exclude."  ECF 64.  Accordingly, on October 5, 2011, plaintiff filed his "Motion to Edit/Strike Testimony."  ECF 67.  Dr. Usher's *de bene esse* deposition transcript is attached to the motion as Plaintiff's Exhibit 1.  *See*  ECF 67-1.

---

[2] This case is assigned to Judge Blake.  Because of a conflict in her schedule, however, I have agreed to preside at the trial, set to commence on October 17, 2011.

[3] By Order of January 26, 2011, the trial date of February 7, 2011, was postponed due to plaintiff's medical condition.

In particular, plaintiff seeks to strike the following portions of the transcript: page 9, line 14 to page 25, line 23; and page 32, line 22 to page 33, line 17.[4]  According to plaintiff, the subject testimony is "irrelevant, immaterial and unfairly prejudicial," and "its probative value (if any) is greatly outweighed by its prejudicial effect."  ECF 67 at 3-4.  Further, plaintiff contends that the timing of the questions was improper, because they were posed during the defense's voir dire of the doctor's qualifications.  Plaintiff concedes, however, that "some of the questions may have been legitimate cross-examination if offered during another portion of the deposition. . . ." ECF 67 at 4.

In his "Response To Plaintiff's Motion To Strike/Edit Testimony" (ECF 68), Dr. Pandey argues that the malpractice action pending against Dr. Usher is similar to this case, and therefore the questions about the other malpractice case are "relevant to prove credibility, bias, prejudice, and motive."  ECF 68 at 2.  Accordingly, Dr. Pandey maintains that the jury should be permitted to consider the questions posed to Dr. Usher regarding the unrelated malpractice action pending against him and Dr. Usher's answers.

For yet another reason, Dr. Pandey's counsel argues that he should be permitted to question Dr. Usher regarding the deposition testimony that Dr. Usher provided in the malpractice case pending against Dr. Usher.  According to defense counsel, Dr. Usher's testimony in his own malpractice case "was inconsistent with some of the opinions" offered by Dr. Usher in the underlying case, and is therefore admissible.  ECF 68, at 2.

In his "Memorandum Of Law In Support Of Defendant's Response To Plaintiff's Motion To Strike/Edit Testimony" (ECF 68-1), Dr. Pandey's attorney adds that plaintiff's counsel did

---

[4] The colloquy between counsel, appearing on page 25, line 23 to page 32, line 16, was transcribed, but was not videotaped.  Therefore, plaintiff states that "the Court need not address [those pages] for purposes of this Motion."  ECF 67 at 2.

3

not object to the "timing" of the defense's questioning of Dr. Usher concerning his own malpractice case.  ECF 68-1 at 11.  He also maintains that plaintiff's counsel did not object to defense counsel's questioning of Dr. Usher regarding his "testimonial experience" or his "lack of familiarity with the Cumberland medical community."  ECF 68-1 at 12 (citing ECF 68-3 at 20-25).  Therefore, the defense maintains, in effect, that plaintiff has waived these contentions.

Additional facts will be included in the discussion of the issues.

## Discussion

At Dr. Usher's *de bene esse* deposition, plaintiff's attorney questioned Dr. Usher about his qualifications, and then tendered him as an expert in the field of urology.  *See* ECF 67-1 at 8.  Dr. Pandey's attorney then began his voir dire examination of Dr. Usher.  *See* ECF 67-1 at 9.  As the voir dire examination proceeded, defense counsel posed a question about the malpractice case pending against Dr. Usher.  *See* ECF 67-1 at 13.  At that point, plaintiff's counsel objected, for the first time, stating:  "And give me a continuing objection to this line."  Dr. Pandey's attorney responded:  "I will grant you a continuing objection."  *See* ECF 67-1, page 13, lines 11-20.  Dr. Pandey's attorney pursued his line of questions and, at pages 19 and 20, the following exchange ensued.

[PLAINTIFF'S COUNSEL]:  Let me stop you here.  Do you have any questions about his qualifications?

[DEFENSE COUNSEL]:  I do.

[PLAINTIFF'S COUNSEL]:  Are we going to hear it now?

[DEFENSE COUNSEL]:  I believe –

[PLAINTIFF'S COUNSEL]:  I will move to strike anything that you've asked as irrelevant.  You know you're not asking him anything about –

[DEFENSE COUNSEL]:  Do you want to go off the videotape?

[PLAINTIFF'S COUNSEL]:  Keep going.

[DEFENSE COUNSEL]:  Do you want to keep going?  This is your videotape, [plaintiff's counsel].

[PLAINTIFF'S COUNSEL]:  I'm moving to strike everything, as you know, so – but I mean, remember I asked you do you have any questions about his qualifications.

[DEFENSE COUNSEL]:  I do.

[PLAINTIFF'S COUNSEL]:  Apparently your answer is no.

ECF 67-1, page 19, line 3 through page 20, line 3.

Clearly, plaintiff's attorney objected to the line of questions concerning the malpractice suit pending against Dr. Usher.  In my view, the general objection was sufficient to encompass an objection to the timing of such questions.  Therefore, the issue concerning the questions about the malpractice suit pending against Dr. Usher is preserved.[5]  However, the questions concerning Dr. Usher's testimonial experience (ECF 67-1 at 21-23) and the questions pertaining to Dr. Usher's knowledge of the Cumberland, Maryland medical community (ECF 67-1 at 23-25) were not the subject of plaintiff's objections.  Although plaintiff's counsel concedes that "some of the questions may have been legitimate cross-examination if offered during another portion of the deposition. . . .," ECF 67 at 7, he failed to specify the particular questions that he regards as "legitimate."  Nor has he provided any basis to conclude that the questions concerning testimonial experience and familiarity with the Cumberland medical community were otherwise improper or irrelevant.  In my view, they are relevant, and I decline to strike them.

I turn to the merits of plaintiff's motion to preclude the defense from questioning Dr. Usher about the medical malpractice case pending against him in New York.

---

[5] Although I agree that the questions were poorly timed, in the exercise of my discretion, I will not strike them on that ground.

As indicated, in the *Simon* case, Dr. Usher allegedly failed to timely diagnose kidney cancer in his patient.   The delayed diagnosis allegedly led to metastasis, and the patient underwent a single nephrectomy.  *See  Simon* Complaint, ECF 68-4.  Notably, Dr. Usher is one of several defendants/physicians involved in the care of Dr. Simon.   And, unlike Dr. Pandey, he was not the kidney surgeon.   Dr. Usher was deposed in the *Simon* case on June 13, 2011; his deposition testimony is appended to Dr. Pandey's response.  *See* ECF 68-5.

In this case, the following *de bene esse* deposition testimony of Dr. Usher is pertinent with regard to the motion to strike:[6]

> [DR. PANDEY'S COUNSEL]:  Now, when I took your deposition, you indicated that you had recently been sued where there was an apparent – where there was apparently a tumor in a kidney that had been missed by some of the X-rays.

> * * *

> [DR. PANDEY'S COUNSEL]:  Is that correct?

> [DR. USHER]:  That's correct.  There was –

> [DR. PANDEY'S COUNSEL]:  Now, as I understand it, the name of that case that you were referring to where there was apparently a tumor in a kidney that had been missed by some of the X-rays, that – the name of that case is Allan Simon versus Dr. Sol Usher, et al.?

> [DR. USHER]:  That's correct.

> [DR. PANDEY'S COUNSEL]:  The case is pending in the Supreme Court for New York, Bronx County; correct?

> [DR. USHER]:  Correct, yes.

> [DR. PANDEY'S COUNSEL]:  And according to the Complaint, you took care of Dr. Simon between January 22, 2007, and August 25, 2008, is that true?

> [DR. USHER]:  Well, there was a longer period of time that I took care of him.

---

[6] These questions were posed during the voir dire on qualifications, although Dr. Pandey's attorney argues that they pertain to bias, not expert qualifications.

[DR. PANDEY'S COUNSEL]:  So you were actually taking care of him before --

[DR. USHER]:  I think it was 2005 or possibly, yes.

[DR. PANDEY'S COUNSEL]:  Now, Dr. Simon, as I understand it from reading the Complaint, was diagnosed with kidney cancer or also known as renal cancer?

[DR. USHER]:  That's correct.

[DR. PANDEY'S COUNSEL]:  The words are interchangeable; correct?

[DR. USHER]:  That is correct.

[DR. PANDEY'S COUNSEL]:  And he was diagnosed with kidney cancer on August 25, 2008, is that true?

[DR. USHER]:  I believe that is -- yeah, that's close enough that I can remember, yeah.

[DR. PANDEY'S COUNSEL]:  Now, the patient ultimately had a nephrectomy for a large renal mass.

[DR. USHER]:  That's correct.

[DR. PANDEY'S COUNSEL]:  You did not perform that nephrectomy, true?

[DR. USHER]:  That is correct.

[DR. PANDEY'S COUNSEL]:  In the Complaint, the plaintiff alleges that you failed to, quote, timely, properly and appropriately diagnose and recognize the plaintiff's renal cancer in causing, permitting and allowing the renal cancer to spread, metastasize and become incurable.  Is that what the allegation is?

[DR. USHER]:  Well, you know what the allegation is.  Yes.

[DR. PANDEY'S COUNSEL]:  Now, you were deposed in that case approximately three months ago [i.e., on June 13, 2011].

[DR. USHER]:  That's correct.

[DR. PANDEY'S COUNSEL]:  Okay.  And you gave a deposition kind of like today where you're under oath –

[DR. USHER]:  Absolutely.

[DR. PANDEY'S COUNSEL]:  – under oath and telling the truth; correct?

[DR. USHER]:  Correct.

[DR. PANDEY'S COUNSEL]:  Now, you did, as I understand it from reading your deposition, you did some sonograms of the plaintiff's kidney in your office.

[DR. USHER]:  That's correct.

[DR. PANDEY'S COUNSEL]:  So you actually performed the sonograms and read the sonograms.

[DR. USHER]:  My technician, licensed technician performed them and I read them.

[DR. PANDEY'S COUNSEL]:  Okay.  And you testified in that deposition that sonogram and CAT scan are both excellent studies for looking for kidney tumor.

[DR. USHER]:  That's correct.

[DR. PANDEY'S COUNSEL]:  You, in that case, in Dr. Simon's case, you did not order an MRI be done.

[DR. USHER]:  No, I did not order it at that time.

[DR. PANDEY'S COUNSEL]:  It was your judgment that an MRI was not necessary.

[DR. USHER]:  That's correct.

[DR. PANDEY'S COUNSEL]:  You felt that an MRI would not be adding anything to the patient's workup in this case.

[DR. USHER]:  The patient was being worked up for some hematuria and enlarged prostate.

[DR. PANDEY'S COUNSEL]:  That's blood in the urine?

[DR. USHER]:  Yeah.

[DR. PANDEY'S COUNSEL]:  The – in that case, the sonograms showed a left kidney cyst, but no mass was found.

[DR. USHER]:  That's correct.

[DR. PANDEY'S COUNSEL]:  Now, you felt that the sonograms were sufficient?

[DR. USHER]:   And there were sonograms done at the hospital with their equipment and –

[DR. PANDEY'S COUNSEL]:  Now –

[DR. USHER]:  And they also did not show any tumor in that kidney.

[DR. PANDEY'S COUNSEL]:   In – so there were sonograms done both by you and by other doctors?

[DR. USHER]:  Correct.

[DR. PANDEY'S COUNSEL]:  And you –

[DR. USHER]:  Neither of which showed any tumor in the kidney.

[DR. PANDEY'S COUNSEL]:  And you testified that had there been a next step, the next step -- CAT scan would have been the next step; correct?

[DR. USHER]:  That is correct.

[DR. PANDEY'S COUNSEL]:  Because compared to an MRI, you testified that a CAT scan is simple and easier to obtain?

[DR. USHER]:  It is easier, yeah.

[DR. PANDEY'S COUNSEL]:   Now, on September 2, 2008, the plaintiff, Dr. Simon, had a nephrectomy and was found to have a 9 and a half centimeter renal cell carcinoma; correct?

[DR. USHER]:  That's correct.

[DR. PANDEY'S COUNSEL]:   [Dr. Simon's] kidney cancer was staged at 3 – I'm sorry, T3B, because it was larger than 7 centimeters.

[DR. USHER]:  That's correct, yeah.

[DR. PANDEY'S COUNSEL]:   And it also, now only was it larger than 7 centimeters, it also involved the renal vein.

[DR. USHER]:  Correct.

[DR. PANDEY'S COUNSEL]:  Which put it at a 3B?

[DR. USHER]:  That is correct.

9

ECF 67-1, pages 13-18.

At his deposition, Dr. Usher offered several opinions critical of Dr. Pandey's care of the plaintiff. It is not necessary to recount all of them here. But, with respect to the delay in operating on plaintiff's left kidney, and the diagnostic testing employed by Dr. Pandey, the following exchange is noteworthy:

[PLAINTIFF'S COUNSEL]:   . . . And what about the timing of that partial nephrectomy on the left side, was that within the standard of care?

[DR. USHER]:  The way – not in the way that – unfortunately, Dr. Pandey took care of this patient.  To wait in a solitary kidney such a long period of time, almost a year and a half – a year and a half before realizing that something is done is just subjecting him to a larger cancer with resultant removal of more of his precious remaining left kidney tissue.  I also don't understand why when the initial lesion was seen on an MRI and not seen on a CAT scan, it makes no sense not to do another MRI.  If you're interested in following a lesion, why choose –

[PLAINTIFF'S COUNSEL]:  Well, let me ask you, when was the bilateral cancer detected, by what type of scan and when?

[DR. USHER]:  It was detected by the MRI scan that he had on March 6, 2006.

[PLAINTIFF'S COUNSEL]:  Okay.  And what scans did Dr. Pandey follow up with?

[DR. USHER]:  Well, he did CAT scans, several, as we have gone over, but what he should have done is do the study that showed the lesion originally.  Why do – if you know the CAT scan didn't show the lesion, then you should do the study that did show the lesion if you want to follow it.  It's just logic.

[PLAINTIFF'S COUNSEL]:  Did [the] CAT scan eventually show the lesion after a long period of time?

[DR. USHER]:  When it was large enough and when the study was done in a proper manner, which was in the study of 2007, apparently the initial CAT scan for some reason, perhaps the timing, there is three phrases to this – the CAT scan, and if the timing wasn't appropriate for the administration allowing enough time for the intravenous contrast to get into the kidney tissue, it's conceivable – it's not conceivable, in fact, it was missed, and then when it was done, repeated in a proper sequencing of time on the images, the lesion did show up.

10

[PLAINTIFF'S COUNSEL]:   And when was that CAT scan repeated?   How much time elapsed?

[DR. USHER]:  About three weeks.

[PLAINTIFF'S COUNSEL]:   Would you normally do two CAT scans within three weeks?

[DR. USHER]:  No.  That's difficult to understand why one would do, expose all of that radiation exposure within three weeks.

[PLAINTIFF'S COUNSEL]:  And did the second CAT scan then show the cancer as well?

[DR. USHER]:  Yes, it does.  It showed, as mentioned, 2.8 by 2.5 centimeters.

[PLAINTIFF'S COUNSEL]:   So it confirmed what was seen on the MRI of March of '06; correct?

[DR. USHER]:  Yes, only significantly larger at this point.

ECF 67-1, page 85, line 7 to page 87, line 20

As noted, Dr. Pandey takes the position that cross-examination about the *Simon* malpractice case is probative of Dr. Usher's bias, prejudice, and credibility in this malpractice case, largely because both involve allegations of negligence in regard to kidney cancer. Defendant cites several cases to support his contention that evidence of an expert witnesses's own malpractice suit is probative of bias, prejudice, and credibility, and therefore admissible.  In my view, these cases are not persuasive.

In *Oberlin v. Akron Gen'l Med. Center*, 743 N.E. 2d 890 (Ohio 2001), the plaintiff brought a medical malpractice action against his hand surgeon, Dr. Hill.  The defense expert, Dr. Vrabec, was deposed and, on cross-examination, he was questioned about a pending malpractice action lodged against him by a former patient, in a matter allegedly involving an injury similar to the one before the court.  The trial court refused to allow the cross-examination concerning the other malpractice case.  In reversing, the Supreme Court of Ohio stated: "We hold that evidence

that an expert witness is a defendant in a pending malpractice action alleging medical error similar to the one at issue is probative and is admissible to prove bias, prejudice, or motive to misrepresent." *Id.* at 892.  The rationale of the court, however, is telling.

The appellate court reasoned that, if the defense expert "were to criticize any aspect of Hill's handling of the surgery," then the plaintiff in the unrelated suit against the defense expert "might seize on that testimony and use it against Vrabec in her own suit.  Therefore, Vrabec might be biased in evaluating Hill's performance for fear that the testimony might be used against him later.  He might be predisposed to find that the doctor here acted within acceptable bounds of competence." *Id.* at 893.  In addition, the appellate court reasoned that "an expert with an active malpractice case against him might be hostile to malpractice claimants in general." *Id.*

In contrast to the case *sub judice*, the expert in *Oberlin* was a *defense* expert.  In this case, Dr. Usher is the *plaintiff's* expert.  The defense does not articulate any reason to explain why a plaintiff's expert, who himself has been sued for malpractice, would be biased or prejudiced against the defendant-physician in evaluating whether the defendant acted outside the standard of care.  If anything, having been sued himself, Dr. Usher arguably would be sympathetic to Dr. Pandey, hostile to medical malpractice claims, with a motive to conclude that Dr. Pandey did *not* deviate from the standard of care, particularly in failing to order additional tests, so as to strengthen Dr. Usher's own position in the *Simon* case.

Notably, Dr. Pandey cites only one case involving questions about other malpractice cases posed to a plaintiff's expert.  In my view, his reliance on that case is misplaced.

In *Navarro de Cosme v. Hospital Pavia*, 922 F.2d 926 (1st Cir. 1991), the plaintiffs argued that the trial court erred in permitting the defense to question plaintiffs' expert during voir dire about various matters.  In particular, the expert was questioned about another case in which

he submitted an inflated invoice for expert witness fees; the suspension of his license as a notary for failure to submit required reports; and that he had been sued in three medical malpractice cases. Noting the wide discretion afforded to the trial judge under Federal Rule of Evidence 608(b), permitting inquiry into specific instances of conduct relevant to credibility, the First Circuit affirmed. It stated: "[I]t is clear that the matters under inquiry and the cross-examination of [plaintiff's expert] all pertain to his credibility as a witness." *Id.* at 933. The case, *sub judice,* however, does not involve the kind of allegations of impropriety that were at issue in *Navarro de Cosme.*

The other cases cited by defendant involve questions posed to defense experts about malpractice suits in which the experts were parties. *See, e.g., Hock v. New York Life Ins. Co.*, 876 P.2d 1242, 1257 (Colo. 1994) (permitting cross-examination of defense medical expert about a civil suit in which the expert was a party, because the questions were relevant to evaluating the expert's credibility and bias; also, the defense "opened the door when it questioned its expert on the accuracy of his testing methods . . ."); *Hayes v. Manchester Mem. Hosp.*, 661 A.2d 123, 126 (Conn. App. 1995) (concluding that the trial court erred in precluding plaintiff from questioning defense expert about a medical malpractice suit brought against him; an "important function of cross-examination is the exposure of a witness's motivation in testifying"); *Underhill v. Stephenson*, 756 S.W.2d 459, 461 (Ky. 1988) (concluding that trial court erred in prohibiting plaintiff from cross-examining defendant's medical expert regarding unrelated medical malpractice case pending against him to show expert's bias); *Irish v. Gimbel*, 691 A.2d 664, 674 (Me. 1997) (concluding that trial court erred in barring cross-examination of defense expert with respect to a settlement, without an admission of liability, of a prior medical malpractice case; the excluded evidence was relevant to a "crucial issue, bias or interest, and if

13

admitted, could have had a controlling influence on a material aspect of the case, i.e., whether defendant deviated from the applicable standard of care");  *Willoughby v. Wilkens,* 310 S.E.2d 90, 97-98 (N.C. App. 1983) (concluding that trial judge erred in barring cross-examination of defendants' medical expert regarding prior medical malpractice claim; "evidence of prior medical negligence claims brought against the expert witness is admissible to show bias or interest on the part of the expert";  and stating: "We hold that the jury should be allowed to consider that an expert witness in the medical negligence case has previously been sued for medical negligence, for the jury could find that this would lead the expert witness to have a bias or interest");  *McGarry v. Horlacher*, 775 N.E.2d 865, 872 (Ohio App. 2002) (concluding that defendant-physician and his physician expert could be cross-examined about opinions they had offered with respect to the standard of care in another case in which the same doctor was sued, and had the same expert, but concluding that the existence of the prior malpractice case, the facts of the case, and its results were not admissible).

The distinction between a plaintiff's expert and a defense expert is not insignificant in the context of this case.  In my view, the pendency of a malpractice suit against Dr. Usher, the plaintiff's expert, has little bearing as to bias or prejudice against the defendant-physician. Alternatively, even if the questions about the malpractice case against Dr. Usher are relevant, I am satisfied that, under Fed. R. Evid. 403, the probative value of such evidence would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and considerations of undue delay.

Dr. Pandey also argues in his response that he is entitled "to question Dr. Usher regarding his deposition in given [sic] testimony in his own malpractice case because his testimony was inconsistent with some of the [expert] opinions he has offered in this case."  ECF 68 at 2.  Dr.

Pandey has identified fifteen pages from Dr. Usher's deposition in the *Simon* case from which defense counsel questioned Dr. Usher at his *de bene esse* deposition.  However, Dr. Pandey's attorney has not clearly specified the particular opinions offered in this case that are supposedly inconsistent with the deposition testimony offered by Dr. Usher in the *Simon* case.  Nor has he elucidated the grounds for his claim of inconsistency.

I have gleaned from the materials submitted to the court that the alleged inconsistency in Dr. Usher's testimony relates to his criticism of Dr. Pandey for failure to order another MRI for plaintiff, given that a left kidney lesion was observed on an early MRI, but not fully evident on a subsequent CAT scan.  Yet, in his own care of Dr. Simon, Dr. Usher did not order an MRI; he relied on other diagnostic tests.  *See*, *e.g.*, ECF 67-1 at page 46 lines 19 to page 47, line 12; page 69, lines 15 to 22; page 85, line 18 to page 86, line 18.

To be sure, Dr. Usher was sued in a medical malpractice case involving allegations of delayed diagnosis of kidney cancer, and this case involves, in part, delayed treatment of renal cancer.  But this facial similarity does not establish the particulars of the *Simon* case, or demonstrate that the two cases are so similar medically as to require the same care and treatment. The instant case involves bilateral, synchronous renal tumors and two kidney surgeries.  The other case does not.  Nor is it clear that there is a one-size-fits-all approach to diagnostic testing in any event.  On the record before me, the allegations against Dr. Usher are not plainly comparable to those against Dr. Pandey, despite the alleged testimonial inconsistency as to the use of diagnostic testing tools such as MRIs, sonograms, and CAT scans.

Under Rule 403 of the Federal Rules of Evidence, I conclude that admission of Dr. Usher's testimony concerning the *Simon* case is not appropriate in this case.  Adequate exploration of the *Simon* case would be necessary to establish the medical comparability of the

two cases so as to show the alleged inconsistency.  That, in turn, would be time consuming.

Moreover, to consider the alleged inconsistency would require an understanding of the details

and nuances of an unrelated, complex medical case, and would divert the jury's attention from

the issues pertinent to this case.

Accordingly, for all these reasons, I will strike from the *de bene esse* deposition of Dr.

Usher the portion of the transcript pertaining to the medical malpractice suit pending against Dr.

Usher.  Specifically, I will strike page 13, line 11 through page 20, line 22, through the word

"but"; page 25, lines 7 through 23; and page 32, line 22 through page 33, line 17.  However, I

will not strike defense counsel's questions concerning Dr. Usher's familiarity with the

Cumberland medical community, or his questions about Dr. Usher's prior testimonial

experience, as those questions are relevant to bias and/or Dr. Usher's qualifications, and no

objection was lodged.

A separate Order follows.


Date:  October 13, 2011                        ____/s/_____
                                               Ellen Lipton Hollander
                                               United States District Judge